CHIEE JUSTICE PETEES
delivered the opinion op the court :
Armstead Blackwell was appointed by the Fayette county court in 1858 guardian for Sarah H. and Mary J. Pettit, infant children of James 0. Pettit, deceased, and executed bond, with Neal McCann and Garrett Watts his sureties.
At the May term, 1861, of said court, on the motion of Watts to be released from his obligation as the surety of Blackwell, a new bond was executed by Blackwell, with Neal McCann alone as his surety, the court having accepted him as such, and thereupon made the following order: “It is further, ordered and adjudged that said Garrett Watts be released as surety upon the bond of Armstead Blackwell, as guardian of Pettit’s heirs, from all loss or damage.”
In 1863 this action in equity was instituted by said infants by B. F. Pettit, guardian ad litem, against Blackwell, and McCann and Watts, the sureties on the first bond, alleging that, by a settlement made by Blackwell in June, 1860, of his accounts as guardian as aforesaid, there was then in his hands the sum of $4,008 99 belonging to Sarah H. Pettit, and $4,080 94 due to Mary J. Pettit; and since the last named period he had received *156 annually the rents of their lands and the hires of their slaves, amounting to large sums of money; but as he had made no other settlement, they could not state the amounts, and pray for a settlement and judgment against Blackwell, McCann and Watts, for the amounts due them respectively by Blackwell.
Watts defended, and relied upon the execution of the bond by Blackwell and McCann, and the order of the Fayette county court, as releasing and discharging him from all responsibility whatever to said wards.
On the hearing, a judgment was rendered in favor of Sarah H. Pettit against Blackwell, McCann and Watts, for five thousand nine hundred and eighty dollars and five cents, with interest from the first day of April, 1865, until paid, and costs; and in favor of Mary J. Pettit against the same persons for six thousand one hundred and eighteen dollars and eight cents, with interest from the date above named till paid; and from that judgment Watts has appealed.
The main question involved in this controversy is, whether Watts was, by the execution of the bond by Blackwell, with McCann as his surety, in May, 1861, the acceptance thereof by the Fayette county court, and the order of said court adjudging Watts released from all loss or damage as the surety of Blackwell, in fact released from liability as surety as aforesaid; and the solution of that question depends upon the proper construction of an act approved 10th March, 1856, entitled “An act to amend the law in relation to guardians,” which is now, for the first time, presented to this court to be construed, and which is in the following language :
“ Seo. 1. Be it enacted by the General Assembly of the Commonwealth of Kentucky, That hereafter, when the security of a guardian wishes to be released as such, *157 he shall apply to the comity court in which he entered security, having first given his principal reasonable notice of his application. The court shall thereupon rule the guardian to give a new bond with sufficient security; and on his failure to do so, remove him, and appoint a new guardian or a curator if it be necessary. If a guardian shall give new bond, when ruled to do so by the court, his former security shall not be bound for any act of his thereafter.
“Sec. 2. If a guardian be removed, as directed in the preceding section of this act, the court shall require him to settle the accounts of his ward, and deliver over the estate to the person who may be appointed in his place; and the court shall have power to make such other orders for the release of the security, and preservation of the estate of the ward, as may be just and proper.”
The counsel for appellees insist that the two sections of this act provide for two entirely different states of case — the first section providing that when a guardian, on the motion of his surety, is ruled by the court to give a new bond, the surety is only released thereby from the acts of the guardian after the execution of the new bond; but for all acts done by him in relation to his ward’s estate, previous thereto, the surety remains bound, the court having no power to release him from liability for his past transactions. And that the second section only provides, that when the guardian fails to give a new bond, and is removed, and the estate of the ward taken out of his hands, the court then has some discretionary powers as to the orders it may make for the preservation of the estate and the release of the surety. And, in support of this interpretation of this statute, they argue that the revisors deemed it unsafe to place the power of releasing the sureties of guardians in the hands of *158 county courts, which, to say the least of it, “ is of doubtful constitutionality,” and they therefore withheld the power altogether; and that, when the Legislature passed the amendatory act now under consideration, it was restricted to the class of cases by them enumerated in language not susceptible of misconstruction.
This interpretation of this statute is plausible; but, in our opinion, cannot be maintained. Before this enactment, the power was not conferred on county courts to release the sureties of guardians in any case. The only remedy the county courts could enforce was upon a case made out to require the guardian to give counter security to his surety; and, on his failing to do so, remove him, or order the estate of the ward to be paid over to a new guardian or a curator. (Sec. 15, art. 1, chap. 43, 1 vol. R. S., p. 576.)
In the opinion of the Legislature it was proper to enlarge the power of county courts so as to afford other protection to the sureties of guardians than that provided for in section 15 supra, and hence the statute under consideration was passed, which is remedial in its character and object.
In order to arrive at the intention of the Legislature in passing an act which constitutes the law, the mere words of the act are not alone to control, but the context and reasons therefor must be considered; “ for, although words are the most common, they are not the only signs of the legislative will.” And in Mason vs. Rogers (4 Litt., 375), Chief Justice Boyle said: “The context, the subject-matter, the effects and consequences, and the reason and spirit of the law, are often all called in to aid in ascertaining the intention of the Legislature. No language is, indeed, so perfect as to afford words to express every idea upon all subjects with perspicuity and precision; and, *159 even when words are not wanting, those that are most happily adapted to the purpose in view do not always occur to the mind of the Legislature. Hence it is that words are employed which sometimes go beyond the legislative will, and sometimes fall short of it; which are sometimes too general and comprehensive, and sometimes too particular and restricted; and it is therefore an established rule of construction, applicable to all remedial statutes, that cases within the reason, though not within the letter of the statute, shall be embraced by its provisions; and cases not within the reason, though within the letter, shall not be taken to be within the statute.”
That it was the intention of the Legislature to provide for the entire release of the surety of a guardian is shown by the first sentence of the first section after the enacting clause, as follows: “When the security of a guardian wishes to be released as such,” he is to pursue the steps therein prescribed. This language precludes the idea that the Legislature contemplated providing for a partial release only, and thus afford but little, if any, relief to the apprehensions of the surety of a failing guardian.
The construction given to the first section of the statute by appellee’s counsel is based upon the concluding sentence thereof, and which, without considering the context and the reason of the enactment, might be adopted; but a very slight transposition of the words of that sentence would entirely demolish the foundation of the argument. For instance, if it had read, if a guardian shall give a new bond, when ruled to do so by the court, his former security shall not thereafter be bound for any act of his (the guardian), thereby applying the release from and after the execution of the bond, and *160 not to the acts done subsequent thereto, it could be scarcely doubted that the surety would be released.
Again, if the construction given to the second section of the act by appellee’s counsel be accepted as the true one, then the whole section is nugatory and useless; for it is not, and cannot be contended, that, if the guardian failed to give a new bond, and was, in consequence thereof, removed, that the surety could be thereby released; and if the guardian should in fact deliver over the estate to the person appointed to receive it, the covenant would be satisfied, and the surety released by operation of law, independent of the statute of the 10th of March, 1856.
We cannot therefore doubt that the Legislature intended by this statute, although the phraseology is somewhat involved and perplexing, to confer on the county courts the power to release the surety of a guardian from all liability on his bond, when, by adopting the mode prescribed, he had caused his principal to execute a new bond, with surety such as the court approved. And, as Watts had procured a new bond to be executed, with such surety as the court approved, we have come to the conclusion that it had.the effect to release him; and, consequently, the judgment charging him with the amount's therein named is erroneous as to him.
Wherefore, the judgment is reversed, and the cause remanded, with directions to dismiss the petition as to appellant.